# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Michelle Gonzales, | : | Case No. 1:13CV1979 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security Administration, | : | **MEMORANDUM AND ORDER** |
| Defendant. | : | |

In accordance with the provisions of 28 U.S.C. § 636(c) and FED. R. CIV. P. 73, the parties in this case consented to have the undersigned Magistrate Judge conduct any and all proceedings in this case including ordering the entry of a final judgment.  Plaintiff seeks judicial review of a final decision of the Commissioner denying his application for Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42 U. S. C. § 1381, *et seq*. and 405(g).  Pending are briefs on the merits filed by both parties (Docket Nos. 16 & 17).  For the reasons set forth below, the Magistrate affirms the decision of the Commissioner.

## I. PROCEDURAL BACKGROUND

On May 25, 2011, Plaintiff applied for SSI and any federally administered State supplementation under Title XVI, alleging disability on May 23, 2011 (Docket No. 11, pp. 167 of 815).  Plaintiff's application was denied on September 13, 2011, and upon reconsideration on December 14, 2011 (Docket No. 11, pp. 94; 100 of 815). On June 25, 2012, Administrative Law Judge (ALJ) Kendra Kleber conducted a hearing at which

Plaintiff, represented by counsel, Laura Ross, and Vocational Expert (VE) Lynn Smith were present and testified (Docket No. 11, pp. 37 of 815).  Vocational Expert Lynn Smith participated via telephone (Docket No. 11, pp. 40 of 815).   The ALJ issued an unfavorable decision on July 18, 2012 (Docket No. 11, pp. 15; 27 of 815).  The Appeals Council denied review of the ALJ's decision on August 6, 2013, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 11, pp. 6 of 815).

## II.  FACTUAL BACKGROUND

**A.    ADMINISTRATIVE HEARING**

**1.    PLAINTIFF'S TESTIMONY**

At the time of the hearing, Plaintiff was forty-one years old and lived with her three children, ages 23, 19, and 15 (Docket No. 11, pp. 44; 56 of 815).  Plaintiff detailed her past employment, testifying that she was last employed part-time as a Secretary for Lorain City Schools from early 2008 until June 2011.  She also noted other past work including as a welder and as a self-employed real estate agent (Docket No. 11, pp. 44-46 of 815).  In response to the ALJ's questions, Plaintiff indicated that her constant pain in her back and throughout her body prevents her from working and described suffering from muscle and joint pain, migraine headaches, and heart issues.  After detailing her heart related issues and VT ablation,[1] Plaintiff described her back pain indicating that she has "severe scoliosis," which has gotten worse over the past three or four years and that the pain has spread to her legs (Docket No. 11, pp. 46-48 of 815).  Despite physical therapy, Plaintiff testified that she experiences regular spasms, daily back pain, which she rated at a five or six out of ten, but noted that her pain can escalate to a nine (Docket No. 11, pp. 49-50 of 815).  Plaintiff indicated that she does

---

[1] VT stands for Venticular Tachycardia, which is a fast heart rhythm that starts in the lower part of the heart. *Ventricular Tachycardia-Topic Overview*, WEBMD (May 14, 2014, 2:25 PM), http://www.webmd.com/heart-disease/tc/ventricular-tachycardia-topic-overview.  Catheter ablation is a procedure used to selectively destroy areas of the heart that are causing a heart rhythm problem. Catheter Ablation for a Fast Heart Rate, WEBMD (May 14, 2014, 2:22 PM), http://www.webmd.com/heart-disease/catheter-ablation-for-a-fast-heart-rate.

not know what triggers her back spasms and pain, but that "they say" its her body weight and the curvature of her spine (Docket No. 11, pp. 50 of 815).

During questioning by her attorney, Plaintiff indicated that she could walk for a minute or two and stand two to three minutes before needing to sit down due to her lower back pain and sciatic nerve (Docket No. 11, pp. 50 of 815).  Plaintiff also noted that sitting too long hurts and requires her to move about in her chair (Docket No. 11, pp. 51 of 815).  Plaintiff indicated that she takes prescribed mediation for her pain, but that it is not always effective (Docket No. 11, pp. 51 of 815).  Plaintiff also testified that she suffers from migraine headaches twice a month, which typically last between two and five days (Docket No. 11, pp. 51 of 815).  Plaintiff indicated that she takes medication for her migraines, but that it has not reduced the frequency of her headaches (Docket No. 11, pp. 51-52 of 815).

Plaintiff testified that she had been enrolled in online college classes for about two years, has not obtained a degree, and has stopped taking classes because of her issues with concentration and pain (Docket No. 11, pp. 52-53 of 815).  Plaintiff also noted in response to her attorney's questions that her anxiety is getting worse and that she has noticed difficulties with attention and concentration outside  her course work. For example, Plaintiff described having to rewind television programming because she did not comprehend something said or that she has to have her kids repeat themselves (Docket No. 11, pp. 53-54 of 815).

Plaintiff otherwise noted that she is forgetful, has difficulty getting along with other people, and limits herself to two friends, which she sees maybe once every six weeks (Docket No. 11, pp. 54 of 815).  In response to questioning, Plaintiff indicated that in the past she has sometimes had difficulty getting along with coworkers or supervisors, but had never received written warnings or had her job end due to work related conflict (Docket No. 11, pp. 54 of 815).  Plaintiff described her bad days in terms of her anxiety and depression testifying that she isolates herself from others at home, is generally less social, and indicated that the frequency of her bad days is four days a week (Docket No. 11, pp. 55 of 815).  Finally, Plaintiff indicated

3

that she drives, but only to her doctors appointments, has her children do her grocery shopping because she is unable to lift anything heavier than a can, has no difficulty dressing or grooming herself, and that her children do all the household work and meal preparation (Docket No. 11, pp. 56 of 815).

## 2.    VE TESTIMONY

Having familiarized herself with Plaintiff's file and vocational background before the hearing, the VE described Plaintiff's past work as a welder, a medium and skilled vocation with a specific vocational preparation (SVP) of 7 (Docket No. 11, pp. 58-59 of 815).[2] ALJ Kleber then posed her first hypothetical question to the VE asking her to imagine a hypothetical worker of the same age, education, and past relevant work experience of the claimant,

> . . .who's able to perform a limited range of . . . work.  That is to say she's able to lift 20 pounds occasionally or 10 pounds frequently; able to stand or walk for six hours out of eight or sit for six hours out eight . . . the work should . . . not involve climbing ladders or scaffolds; only occasionally require climbing, stairs or ramps; the works should not require constant attention, so as a result it should not involve exposure to hazards such as unprotected heights or uncovered industrial machinery; and the work should involve no more than occasional and superficial interaction with the public or with coworkers.  Now, would such a person be able to perform any [Plaintiff's] past work?

(Docket No. 11, pp. 60-61 of 815).  Taking the hypothetical into account, the VE indicated that such a person would not be able to perform any of Plaintiff's past work (Docket No.1 11, pp. 61 of 815).  ALJ Kleber followed up asking whether there were any other jobs that the hypothetical person could perform.  The VE answered affirmatively and noted that mail clerk would be an example of such a job.  The VE described the mail clerk job as an unskilled occupation of a light exertion level and SVP of 2.  The VE indicated that such jobs are prevalent in the national economy and that there are 1,200 such jobs in the local area, 6,00 in the

---

[2]

SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. www.onetonlne.org.  SVP is a component of Worker Characteristics information found in the Dictionary of Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how the occupations are performed.  www.occupationalinfo.org.

State of Ohio, and 150,000 nationally.

The next job suggested by the VE was that of an assembler, an unskilled occupation of a light exertion level and SVP of 2.  The VE noted that there are 3,500 of these jobs in the local area, 20,000 in the State of Ohio, and 800,000 in the nation.  The VE also proffered the job of cleaner, an unskilled occupation of a light exertion level and SVP of 2 (Docket No. 11, pp. 61 of 815).  The VE testified that there are around 5,000 of these jobs in the local area, 30,000 in the State of Ohio, and 900,000 in the nation (Docket No. 11, pp. 61-62 of 815).  In response to ALJ Kleber's question, the VE indicated that this was a representative sample and not an exhaustive list of jobs (Docket No. 11, pp. 61-62 of 815).

ALJ Kleber posed his second hypothetical asking:

Imagine the same person . . . who also needs the ability to change position at will at the work station.  Now, I don't mean taking unscheduled breaks, but I do mean just able to sit or stand . . . while continuing the work.  Are there jobs . . . such a person could perform?

(Docket No. 11, pp. 62 of 815).  Taking into account these limitations, the VE noted that such an individual would be able to perform the mail clerk and assembler, but not the cleaner positions.  Instead of the position of cleaner, the VE listed the position of office helper, an unskilled occupation of a light exertional level and SVP of 2.  The VE noted that there are 800 of these jobs in the local area, 3,000 in the State of Ohio, and 100,000 in the nation (Docket No. 11, pp. 62 of 815).

On cross-examination, Plaintiff's attorney asked the VE whether an employer would tolerate an employee being absent from work one day per week on account of their symptoms of pain.  The VE responded that she did not believe so and when asked, indicated that the typical absenteeism allowed in unskilled employment is usually one to two days a month outside any probationary period.  Plaintiff's attorney followed up asking whether an employer would tolerate an individual with attention and concentration difficulties that would result in the individual being off-task 20 percent of the day.  The VE answered that an employer would not tolerate an individual being off-task that much (Docket No. 11, pp. 63

5

of 815).

**B.    MEDICAL RECORDS**

Plaintiff's case record contains office treatment records, consultative examination reports, and follow up evaluations from numerous medical sources concerning an array of medical conditions, some of which are not directly relevant to the claims before this Court. The pertinent medical records are summarized below to the extent necessary for disposition of this case:

**1.    PHYSICAL HEALTH RECORDS**

**a.    DR. SAMIR J. SHAIA, D.O.**

Plaintiff's case record contains treatment records for two evaluations Plaintiff had with Dr. Shaia concerning her scoliosis and related symptoms. On March 15, 2011, Plaintiff's records reflect that she complained of back pain, and that her x-rays showed significant levoscoliosis of the lumbar spine, facet arthrosis, and degenerative disc spine narrowing. Dr. Shaia recommended a customized physical therapy program for Plaintiff and prescribed her a Medrol Dose pack[3] and Ultram[4] medications (Docket No. 11, pp. 389-390 of 815).

On March 31, 2011, Plaintiff reported she was unable to attend physical therapy due to her discomfort. The results of an MRI revealed lumbar levoscoliosis, mild discogenic degenerative changes to the lower lumbar spine with bulging discs from L3 to S1, and left-sided neural foraminal narrowing at L5-S1 that is suspected to compromise the transiting left L5 nerve root (Docket No. 11, pp. 386-388 of 815). The

---

[3]

Medrol is used to treat conditions including arthritis. *Medrol (Pak) oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 11:08 AM), http://www.webmd.com/drugs/drug-11321-Medrol+Pak+Oral.aspx?drugid=11321&drugname=Medrol+(Pak)+Oral.

[4]

Ultram medication is used to help relieve moderate to moderately severe pain. *Ultram oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 11:10 AM), http://www.webmd.com/drugs/drug-11276-Ultram+Oral.aspx.

treatment record reflects that Dr. Shaia opined that Plaintiff would be an excellent candidate for epidural steroid injections, but that she does not want to have the cortisone injections and would prefer having surgery. The record contains a notation that Dr. Shaia told Plaintiff that "we cannot guarantee that she will need surgical intervention but I could definitely send her for a consultation."  The treatment notes indicate that Dr. Shaia referred Plaintiff to Dr. Jeffrey Roberts, and prescribed her Prednisone[5] for discomfort (Docket No. 11, pp. 386 of 815).

### b.    DR. TOOMAS ANTON, M.D.

On April 22, 2011, Plaintiff had a neurosurgical evaluation with Dr. Anton (Docket No. 11, pp. 478-479 of 815).  A letter summarizing the consultation noted that Plaintiff complained of back and intermittent leg pain, which she rated at a four or five out of ten in intensity.  Dr. Anton examined Plaintiff and reviewed her MRI and x-rays, noting that they demonstrate significant left-sided scoliotic curve.  Dr. Anton's treatment notes reflect that he did not recommend neurosurgical intervention, wanted Plaintiff to quit smoking, start aqua therapy to strengthen her core muscles, and have a long cassette scoliosis x-rays taken (Docket No. 11, pp. 478-479 of 815).  A report dated April 23, 2011, reflects that Plaintiff had x-rays of her thoracolumbar spine and reported dextroscoliosis of Plaintiff's dorsal spine and levoscoliosis of the lumbar and lower dorsal spine, with scoliosis curves measuring 40 and 43 degrees respectively (Docket No. 11, pp. 481 of 815).

### c.    DR. NICHOLAS U. AHN, M.D.[6]

On May 26, 2011, Plaintiff had a consultation with Dr. Ahn for her scoliosis.  Dr. Ahn noted that

---

[5]

Prednisone is uses to treat conditions including arthritis. *Prednisone oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 11:13 AM), http://www.webmd.com/drugs/mono-9383-PREDNISONE+-+ORAL.aspx?drugid=6007&drugname=prednisone+Oral

[6] Dr. Ahn's letter notes his titles as Associate Professor of Orthopedic Surgery at Case Western Reserve University School of Medicine, and Director of Spinal Surgery at Louis Stokes Veterans Medical Center (Docket No. 11, pp. 424 of 815).

Plaintiff was quite adamant that she wanted surgery to correct her scoliotic curvature.  Plaintiff's neurologic examination indicated that Plaintiff has full strength in her lower extremities, numbness in her L5 distribution on her left side, and antalgic gait when she walks.  Dr. Ahn noted that when Plaintiff ambulates she uses a cane in her left hand, which is inconsistent with symptoms that are primarily on the left side.  After reviewing recent x-rays and a previous report concerning Plaintiff's scoliosis curvature from 1998, Dr. Ahn opined that Plaintiff's scoliotic curvature has not changed in over ten years (Docket No. 11, pp. 422-423 of 815).  Dr. Ahn indicated that he reviewed Plaintiff's MRI from March 2011, which demonstrates some left neural foraminal stenosis and disc herniation, but that the nerve compression is not all that severe.  Dr. Ahn noted that Plaintiff's nerve compression could be causing some of her symptoms, but that surgery was not appropriate for treating pain and could in fact make her symptoms worse.  Furthermore, Dr. Ahn's consultation summary documents Plaintiff's spine curvature at 45 degrees and explained that spine curvature which is less than 50 degrees in adults does not typically progress.  Dr. Ahn recommended epidural steroid injections to treat Plaintiff's symptoms, but noted that she did not wish to try this treatment.  He indicated that Plaintiff's preference for surgery gave him significant concerns about her motivations for unreasonable treatment.  Dr. Ahn noted that Plaintiff wanted a second opinion and that he gave her a list of several other spine surgeons (Docket No. 11, pp. 423-424 of 815).

### d.  DR. MICHAEL D. EPPIG, M.D.

On June 1, 2011, Plaintiff visited Dr. Eppig complaining of back pain and flare ups (Docket No. 11, pp. 357 of 815).  Plaintiff was described as "a very anxious woman who is reasonably cooperative, but she is verbally complaining of pain with every maneuver and request during the exam."  Another note reflects that "[Plaintiff] says 'ow' with everything she does."  The results of Dr. Eppig's physical examination noted that Plaintiff had no ability or willingness to bend to the left; is barely able to bring her fingertips to her proximal tibitas; and has negative straight leg raising.  Dr. Eppig's findings reflect that Plaintiff has a right

8

T4-T10 scoliosis of 40 degrees and a left T11-L4 scoliosis of 45 degrees, but no lateral dislocation.  An earlier MRI scan of Plaintiff's lumbar spine was also reviewed by Dr. Eppig and he indicated that Plaintiff has mild degenerative changes in the L3, L4, and L5 discs, and documented narrowing of the fourth and fifth nerve roots (Docket No. 11, pp. 357-358 of 815).  Dr. Eppig concluded that Plaintiff has scoliosis, but there was no urgent need for surgical intervention.  He noted that in the long run surgery is recommended to limit the worsening of the curve and degenerative processes.  Dr. Eppig prescribed Plaintiff Mobic and Flexeril[7] (Docket No. 11, pp. 358 of 815).

### e. DR. MICHAEL B. ROCCO, M.D.

Plaintiff's case record contains treatment records from Dr. Rocco for her chest pain.  Those records indicate that Plaintiff first experienced symptoms of chest pain in July 2011, and that an EKG revealed that she had an irregular heart beat.  Dr. Rocco's treatment records detail Plaintiff's extensive cardiac and blood testing, cardiac catheterization, statin medications, and consultations with other cardiologists.  In January 2012, Dr. Rocco opined that there is no clear cardiac cause for Plaintiff's chest discomfort despite repeated tests and suggested that she consult with her primary care physician to look for noncardiac causes of her symptoms (Docket No. 11, pp. 474-475; 466-467; 717-718 of 815).

### f. DR. ANANT JEET, M.D.

The case record also contains treatment records for issues concerning her thyroid, which are summarized below.

- On August 24, 2011, Plaintiff had a consultation with Dr. Jeet and the treatment notes reflect that Plaintiff's thyroid antibodies were elevated, her thyroid gland was described as slightly enlarged, and that there appeared to be a multinodular goiter.  The diagnosis detailed mild hypothyroidism secondary to Hashimoto Disease, and goiter.  Dr. Jeet recommended a thyroid

---

[7]

Flexeril is used to treat muscle spasms. *Flexeril oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (May 12, 2014, 11:25AM), http://www.webmd.com/drugs/drug-11372-flexeril+oral.aspx.

ultrasound, prescribed levothyroxine,[8] and noted that Plaintiff would repeat thyroid function tests and thyroid antibodies in 6-8 weeks (Docket No. 11, pp. 489-490 of 815).

- On October 19, 2011, a partial record notes that Plaintiff saw Dr. Jeet for her thyroidism and indicates that Dr. Jeet continued Plaintiff on her " leyathyroxin" at 75 MCG and requested TSH testing in six to eight weeks (Docket No. 11, pp. 806-807 of 815).

- On January 3, 2012, Plaintiff saw Dr. Jeet concerning her hypothyroidism and complained of fatigue, unexpected weight change, and back pain. Plaintiff was instructed to continue taking leyathyroxin (Docket No. 11, pp. 797-799 of 815).

- On April 11, 2012, Plaintiff was examined by Dr. Jeet for her hypothyroidism. The treatment plan notes increasing her Synthroid[9] dosage (Docket No. 11, pp. 800-804 of 815).

### g. DR. MOHAMED KANJ, M.D.

On October 21, 2011, Plaintiff had consultation with Dr. Kanj to seek a second opinion concerning her chest pain. After reviewing Plaintiff's cardiac test results, Dr. Kanj determined that Plaintiff had frequent premature ventricular contractions (PVC),[10] which were not suppressed during her stress test and that there were couplets and nonsustained VT. Plaintiff was prescribed Cardizem[11] and it was decided that Plaintiff would undergo an ablation procedure (Docket No. 11, pp. 522 of 815).

On December 22, 2011, Plaintiff was admitted to Cleveland Clinic Hospital for her ablation

---

[8]

Levothyroxine is used to treat underactive thyroid. *Levothyroxine oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, (May 12, 2014, 11:32AM), http://www.webmd.com/drugs/drug-1433-Levothyroxine+Oral.aspx?drugid=1433.

[9]

Synthroid is another name for levothyroxine. *See Synthroid (Levothyroxine Sodium) Drug Information: Description, User Reviews, Drug Side Effects*, RXLIST (May 12, 2014, 11:36 AM), http://www.rxlist.com/synthroid-drug htm.

[10]

Premature ventricular contractions is a too-early heartbeat that originates in the ventricles and disrupts the heart's normal rhythm. *Premature Ventricular Contractions*, CLEVELAND CLINIC (May 14, 2014, 3:29 PM), http://my.clevelandclinic.org/heart/disorders/electric/premature-ventricular-contractions.aspx.

[11]

Cardizem is used to prevent chest pain. Cardizem oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing, WebMD (May 12, 2014, 11:38 AM), http://www.webmd.com/drugs/drug-6709-Cardizem+Oral.aspx?drugid=6709&drugname=Cardizem+Oral.

procedure. The hospital records reflect the procedure was done successfully and that Plaintiff was discharged on December 23, 2011, with instructions not to engage in heavy lifting, pushing or pulling for one week and maintain a low fat and low salt diet (Docket No. 11, pp. 558-559; 732-751; 773-775 of 815).

### h. CHIROPRACTIC & PHYSICAL THERAPY - HEALTH SOLUTION CENTERS

On December 21, 2011, Plaintiff underwent an initial evaluation with Health Solution Centers for treatment related to her mid and lower back pain. On the day of her initial evaluation, the treatment records reflect that she rated the severity of her pain at an eight out of ten and noted the frequency of her pain at 90% (Docket No. 11, pp. 599-600 of 815). Plaintiff's treatment plan noted that Plaintiff would receive chiropractic manipulation and indicated that she would receive treatment bi-weekly for four weeks (Docket No. 11, pp. 597 of 815). The record contains notes concerning six treatment sessions from January 9, 2012 through February 11, 2012. The notes of those therapy sessions indicate that Plaintiff experienced pain in her cervical, thoracic, and lumbar regions, responded favorably to treatment during each session, but noted that her condition remained unchanged, and during her last treatment session her condition was described as getting worse (Docket No. 11, pp. 592-595 of 815).

### i. DR. OSAMA MALAK, M.D. M.SC., FIPP

On February 15, 2012, Plaintiff had an initial evaluation with Dr. Malak for lower back pain. Dr. Malak's examination of Plaintiff noted scoliosis of her thoracic and lumbar spine, tenderness in her mid to lower lumbar level, and that her straight leg test was painful (Docket No. 11, pp. 587 of 815). After reviewing her previous MRI, Dr. Malak indicated that Plaintiff has degenerative disc disease and mild disc bulge in the lower lumbar spine (Docket No. 11, pp. 587-588 of 815). Dr. Malak's recommended Plaintiff start warm water aquatherapy to increase mobility, and included instructions for Plaintiff to start Zanaflex,[12]

---

[12]

Zanaflex is used to treat muscle spasms caused by conditions such as multiple sclerosis or a spinal cord injury. *Zanaflex oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 11:41

Nerontin,[13] and Daypro.[14]  The record also notes that Plaintiff prefers not to have a cortisone injection (Docket No. 11, pp. 588 of 815).

On March 29, 2012, Plaintiff reported that physical therapy had improved her lower back and left leg pain (Docket No. 11, pp. 588-590 of 815).  Dr. Malak's notes indicate Plaintiff had stopped taking Zanaflex, Neurontin, felt that Daypro was causing her weight gain and swelling, and never took the Topamax[15] citing past experience with the drug and side effects. No additional treatment or medication modification was noted (Docket No. 11, pp. 590 of 815).

### j.   DR. JOEL B. HOLLAND, M.D.

On February 17, 2012, Plaintiff saw Dr. Holland who noted reviewing Plaintiff's cardiac testing results and medical records from Dr. Kanj and Dr. Rocco (Docket No. 11, pp. 689-695 of 815).  The assessment and treatment plan noted that Plaintiff was doing well following her catheter ablation and that Dr. Holland was optimistic since there had not been any recurrence of arrhythmias.  The treatment records note that Plaintiff was anticipating back surgery and Dr. Holland concluded that he had no reservations with Plaintiff having the surgery from his EP stand point (Docket No. 11, pp. 695 of 815).

### k.   PHYSICAL THERAPY - REHABILITATION CONSULTANTS INC.

---

AM), http://www.webmd.com/drugs/drug-14706-Zanaflex+Oral.aspx?drugid=14706.

[13]

Neurontin is used with other medications to relieve nerve pain. *Neurontin oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 11:43 AM), http://www.webmd.com/drugs/mono-8217-GABAPENTIN+-+ORAL.aspx?drugid=9845&drugname=neurontin.

[14]

Daypro is an anti-inflammatory drug. *Daypro oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 11:45 AM), http://www.webmd.com/drugs/drug-6746-Daypro+Oral.aspx?drugid=6746&drugname=Daypro+Oral.

[15]

Topamax is used to prevent migraine headaches and decrease their frequency. *Topamax oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 11:47 AM), http://www.webmd.com/drugs/mono-6019-TOPIRAMATE+-+ORAL.aspx?drugid=14494&drugname=topamax+oral.

On February 20, 2012, Plaintiff had an initial evaluation for physical therapy with Rehabilitation Consultants Inc.  The summary of Plaintiff's evaluation notes she had been referred by Dr. Malak and had been diagnosed with scoliosis and disc bulge in her lumbar spine.  At that time, Plaintiff rated her pain at an eight out of ten (Docket No. 11, pp. 615-618 of 815).  The record contains notes for 21 physical therapy sessions from March 2, 2012 through April 20, 2012.[16]  Over the course of her therapy sessions, the records note that Plaintiff was able to perform the requested exercises and was progressing in her treatment. Plaintiff's session records also reflect improvement in her pain and soreness levels (Docket No. 11, pp. 608-614 of 815).  A discharge summary for Plaintiff's physical therapy reflects that Plaintiff had an injection and reported significant improvement.  She was noted as having rated her spine pain at a two or three out of ten and was otherwise "discharged from physical therapy having partially achieved all goals" (Docket No. 11, pp. 607 of 815).

## 2.  NEUROLOGICAL AND PSYCHOLOGICAL HEALTH RECORDS

### a.  DR. PARIKH SANJAY, M.D.

Plaintiff's case record contains treatment records from Dr. Sanjay for her attention deficit hyperactivity disorder (ADHD),[17] anxiety and insomnia from September 2009, through January 2011:

- On September 22, 2009, Plaintiff had an initial evaluation with Dr. Sanjay for possible ADHD with anxiety and sleep difficulty.  Dr. Sanjay's impression was that Plaintiff's attention deficit symptoms were likely related to depression and anxiety.  Dr. Sanjay increased Plaintiff's dosage for her Strattera[18] medication, prescribed her Celexa for anxiety and depression, and

---

[16]

Plaintiff actually received treatment on 17 of those dates as she cancelled three of her sessions and was a no show for her last therapy session (Docket No. 11, pp. 608-614 of 815).

[17]

ADHD is a condition which affects a patient's ability to maintain attention and concentration. *What Is ADHD? Attention Deficit Hyperactivity Disorder: What You Need to Know*, WEBMD (May 14, 2014, 3:36 PM), http://www.webmd.com/add-adhd/guide/attention-deficit-hyperactivity-disorder-adhd.

[18]

Strattera is used to treat ADHD. *Strattera oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 11:50 AM),

13

requested Plaintiff have an EEG.  Dr. Sanjay also requested lab results from Dr. Jaybar (Docket No. 11, pp. 381 of 815).  Those lab results note that Plaintiff had abnormal readings for cholesterol and include a notation for a low fat, low cholesterol diet (Docket No. 11, pp. 365 of 815).

- On November 3, 2009, Plaintiff complained of daily headaches.  Plaintiff otherwise reported doing well on Strattera and Celexa.  Dr. Sanjay advised Plaintiff to take Treximet[19] at the onset of migraine headaches rather than Tylenol (Docket No. 11, pp. 378 of 815).

- On January 8, 2010, Plaintiff complained she was having lots of social issues including anxiety and panic attacks when she wakes up, and sleep difficulty at night.  Dr. Sanjay maintained Plaintiff's Strattera medication, increased her dosage of Celexa, and discussed with Plaintiff behavior modification, counseling, and seeing a psychologist (Docket No. 11, pp. 375 of 815).

- On May 6, 2010, Plaintiff complained she was still having problems with her attention span and concentration, but noted improvement with her anxiety and panic attacks.  Dr. Sanjay restarted Plaintiff on Focalin XR[20] and continued Plaintiff on Celexa, Strattera and Treximet as needed (Docket No. 11, pp. 372 of 815).

- On September 9, 2010, Plaintiff complained that she was still having problems with attention and concentration. Dr. Sanjay increased Plaintiff's dosage of Celexa, Focalin, and Strattera (Docket No. 11, pp. 369 of 815).

- On January 4, 2011, Plaintiff complained of sleep difficulties at night and that her medication was wearing off too soon.  Dr. Sanjay maintained Plaintiff on all of her medications but added 5 mg of Focalin in the afternoon.  Dr. Sanjay discussed sleep hygiene, and the importance of exercise with the Plaintiff (Docket No. 11, pp. 366 of 815).

**b.      DR. MARK D. BEJ, M.D.**

The record reflects that on April 11, 2011, Plaintiff began treating with Dr. Bej for her ADD, migraine

headaches, panic attacks, and insomnia and that she maintained this treating relationship through April 2012,

---

http://www.webmd.com/drugs/drug-64629-Strattera+Oral.aspx?drugid=64629&drugname=Strattera+Oral.

[19]

Treximet is used to relieve headache pain and other migraine symptoms. *Treximet oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 11:52 AM), http://www.webmd.com/drugs/drug-150380-Treximet+Oral.aspx?drugid=150380&drugname=Treximet+Oral

[20]

Focalin XR is used to treat ADHD. *Focalin XR oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 11:57 AM), http://www.webmd.com/drugs/drug-93487-Focalin+XR+Oral.aspx?drugid=93487&drugname=Focalin+XR+Oral.

which is the latest treatment record contained in Plaintiff's case.

- On April 11, 2011, Plaintiff had an initial consultation with Dr. Bej and complained of migraines, panic attacks, sleep disruption, and ADD. Dr. Bej increased Plaintiff's Focalin XR dosage, scheduled a sleep study, changed Plaintiff's Citalopram[21] medication to Alprazolam,[22] and recommended a consultation with Dr. Almhana/Haider (Docket No. 11, pp. 412-413 of 815).

- On July 7, 2011, Plaintiff saw Dr. Bej and reported that she had not yet seen a psychiatrist, or had a sleep study, but had a GPA of 3.8. Dr. Bej noted Plaintiff was to reschedule her sleep study, he increased her dosage of Adderall,[23] and changed her Bupropion[24] medication (Docket No. 11, pp. 555 of 815).

- On September 22, 2011, Plaintiff reported that she had stopped taking Adderall due to chest pains. Dr. Bej replaced Plaintiff's Adderall medication with Vyvance for her ADHD, instructed her to obtain her hospital discharge paperwork, and referenced a second psychological opinion with Dr. Haider (Docket No. 11, pp. 554 of 815).

- On October 17, 2011, Plaintiff had a follow-up evaluation. Dr. Bej increased Plaintiff's dosage of Vyvance, prescribed Guanfacine,[25] and ordered a urine test (Docket No. 11, pp. 553 of 815).

- On November 17, 2011, Plaintiff reported that her primary medical doctor stopped her on

---

[21]

Citalopram is used to treat depression. *Citalopram oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 11:59 AM), http://www.webmd.com/drugs/drug-1701-Citalopram+Hydrobromide+Oral.aspx?drugid=1701.

[22]

Alprazolam is uses to treat anxiety and panic disorders. *Alprazolam oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 12:03 PM), http://www.webmd.com/drugs/mono-7244-ALPRAZOLAM+-+ORAL.aspx?drugid=8171&drugname=Alprazolam+Oral&source=0

[23]

Adderall is used to treat ADHD. *Adderall oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 12:04 PM), http://www.webmd.com/drugs/drug-63163-Adderall+Oral.aspx?drugid=63163.

[24]

Bupropion is an antidepressant. *Wellbutrin oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 12:07 PM), http://www.webmd.com/drugs/drug-13509-Wellbutrin+Oral.aspx?drugid=13509.

[25]

Guanfacine is used to treat high blood pressure. Guanfacine oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing, WebMD (May 12, 2014, 12:09 PM), http://www.webmd.com/drugs/mono-8024-GUANFACINE+-+ORAL.aspx?drugid=5481&drugname=Guanfacine+Oral&source=0.

15

Guanfacine and replaced it with Clonazepam[26] and that she had not yet done a sleep study. Dr. Bej discontinued her Clonazepam medication, increased her Vyvance dosage, restarted and increased her dosage of Guanfacine, and requested that she inquire with Dr. Mensah about using Risperidone[27] or similar medication to aid with sleep (Docket No. 11, pp. 551 of 815).

- On December 19, 2011, Plaintiff reported that Vyvance was not effective and that her grades had slipped from A-B to C-D. Plaintiff also noted difficulty sleeping. Dr. Bej's notes reflect that he wanted Plaintiff to try Clonidine[28] or Risperidone if okay with Dr. Mensah. He also indicated that he wanted Plaintiff to retry Focalin XR (Docket No. 11, pp. 785 of 815).

- On January 12, 2012, Plaintiff reported feeling fatigue and that her Focalin XR medication was not very affective. Plaintiff indicated that she felt Adderall had been most effective out of the medications she tried. Plaintiff was prescribed Adderall XR and advised to notify Dr. Bej's office of any significant changes in symptoms (Docket No. 11, pp. 783 of 815).

- On February 13, 2012, Plaintiff reported that the Adderall had been more effective than Focalin and that her grades have been very good. Plaintiff's medications were maintained (Docket No. 11, pp. 782 of 815).

- On April 27, 2012, Plaintiff reported no new changes since her previous evaluation. Dr. Bej gave Plaintiff prescriptions for Adderall and "ZNS100 mg" (Docket No. 11, pp. 781 of 815).

### c.    GABRIELLA PALMA, M.D.

While Plaintiff was treating with Dr. Bej, the record also contains handwritten treatment notes for Dr.

Palma's treatment of Plaintiff for ADHD, anxiety and depression, and insomnia.

- On April 15, 2011, Plaintiff was examined for her ADHD. Dr. Palma stopped Plaintiff's Focalin, Folalin XR, Strattera, and Celexa medications and instead put her on Adderall and

---

[26]

Clonazepam is used to treat panic attacks. *Clonazepam oral: Uses, Side effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 12:12 PM), http://www.webmd.com/drugs/mono-6006-CLONAZEPAM+-+ORAL.aspx?drugid=14403&drugname=Clonazepam +Oral&source=0.

[27]

Risperdal is used to treat certain mental and mood disorders including schizophrenia and bipolar disorder and can help the patient think more clearly. *Risperdal oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 12:14 PM), http://www.webmd.com/drugs/drug-9846-Risperdal+Oral.aspx?drugid=9846&drugname=Risperdal+Oral.

[28]

Clonidine is used to help treat high blood pressure. *Clonidine oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 12:19 PM), http://www.webmd.com/drugs/mono-24-CLONIDINE+-+ORAL.aspx?drugid=11754&drugname=Clonidine+Oral& source=0

Wellbutrin.  Dr. Palma noted wanting to wait to address Plaintiff's insomnia until she is stable on Adderall and Wellbutrin (Docket No. 11, pp. 410 of 815).

- On May 31, 2011, Plaintiff complained of insomnia.  Dr. Palma discontinued Plaintiff on Trazadone, prescribing her Rozerem[29] instead.  Dr. Palma advised Plaintiff that she would not prescribe her with any additional medications that are potentially habit forming and the record indicates that Plaintiff has an appointment with a new doctor scheduled on July 7, 2011 (Docket No. 11, pp. 406 of 815).

The case record also contains a letter from Dr. Palma addressed to Plaintiff, which is dated May 27, 2011, and informs the Plaintiff that Dr. Palma will no longer be providing Plaintiff with medical care (Docket No. 11, pp. 407 of 815).

### d. DR. ROBERT L. STEVENS, D.O.

- On June 30, 2011, Plaintiff established primary care with Dr. Stevens.  Plaintiff complained of night sweats, weight gain, feeling swollen, and chronic back pain. Dr. Stevens noted Plaintiff's scoliosis of the lower thoracic and lumbar spine, referring her to "Dr. Sese" for evaluation and management of her ADHD and migraine headaches and to Dr. Mensah for evaluation and management of her ADHD associated with panic attacks and insomnia.  Dr. Stevens ordered blood testing and urinalysis  (Docket No. 11, pp. 509-511 of 815).

- On July 27, 2011, the treatment record details the results of an earlier EKG which revealed atrial trigemeny and blood tests which noted elevated cholesterol, triglycerides, low-density lipoprotein (LDL), and thyroid stimulating hormone (TSH).  Plaintiff's examination record notes that she had a predominantly regular heart rate and rhythm with an occasional abnormal beat. Plaintiff's medications were maintained with the addition of Pravastatin,[30] and there is a notation that Plaintiff is to have a 24- Hour Holter monitor, and undergo additional testing (Docket No. 11, pp. 506-507 of 815).

- On August 10, 2011, Plaintiff complained of dizzy spells, nausea, and sweating episodes, which had developed two days earlier.  Dr. Stevens noted that fluid in Plaintiff's right ear had resolved and she was feeling better, but was fatigued and had intermittent sensations of mild

---

[29]

Rozerem is used to treat insomnia. *Rozerem oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 12:24 PM), http://www.webmd.com/drugs/drug-94034-Rozerem+Oral.aspx?drugid=94034&drugname=Rozerem+Oral.

[30]

Pravastatin is used in combination with dieting to lower bad cholesterol such as LDL and triglycerides. *Pravastatin oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (May 12, 2014, 12:38 PM), http://www.webmd.com/drugs/drug-6989-Pravastatin+Oral.aspx.

disequilibrium.[31]  Plaintiff was instructed to maintain her medications, and a diet low in cholesterol, fat, and sodium  (Docket No. 11, pp. 504-505 of 815).

- On October 12, 2011, Plaintiff had an evaluation after having been hospitalized with chest pains.  She also complained of back pain.  Plaintiff was instructed to maintain current medical management, and a diet low in cholesterol, fat, sodium, with fruit and vegetables (Docket No. 11, pp. 499-500 of 815).

- On January 18, 2012, the treatment notes reflect that she had an ablation procedure performed by Dr. Kanj in December and had been doing relatively well since that time.  Dr. Stevens' treatment plan indicates that Plaintiff was to continue her medications as directed, and maintain a diet low in cholesterol, fat, sodium, with fruit and vegetable diet (Docket No. 11, pp. 567-569 of 815).

### e. FELICIA FIOR-NOSSEK, MERCY SPECIALTY PHYSICIANS - MENTAL RFC

The record contains a mental RFC assessment of Plaintiff's ability to do work related activities by Felicia Fior-Nossek, an Advanced Practice Registered Nurse with Mercy Speciality Physicians, which is dated May 30, 2012.  In her assessment, Ms. Fior-Nossek noted treating Plaintiff for ten months (Docket No. 11, pp. 779 of 815).  Ms. Fior-Nossek opined that Plaintiff is unable to work, and has moderate, marked, or extreme limitations in almost every area of inquiry.  Among Ms. Fior-Nossek's written comments is a notation that Plaintiff answered 12 out of 13 on her Mood Disorder Questionnaire (MDQ) and "scored positive for Bipolar disorder."  Ms. Fior-Nossek also included her observations of Plaintiff's symptomatology noting depression, panic attacks, mood swings, poor tolerance of people, racing thoughts, difficulty with sleep, history of being impulsive, poor response and tolerance to medications, history of assault, and history of overdose in a suicide attempt (Docket No. 11, pp. 777-779 of 815).

### D. AGENCY CONSULTATIONS

### 1. PSYCHOLOGIST JAMES N. SPINDLER, M.S.

---

[31]

Disequilibrium is a loss or lack of equilibrium or feeling unsteady on ones feet. *See Dizziness Causes and Types: Vertigo, Lightheadedness and More*, WEBMD (May 12, 2014, 12:43 PM), http://www.webmd.com/first-aid/understanding-dizziness-basics.

On August 18, 2011, Plaintiff underwent a psychological evaluation with Mr. Spindler on referral from the Ohio Division of Disability Determination for an evaluation related to her claim for disability benefits.  Mr. Spindler's evaluation is summarized in a seven-page document which includes the results of his interview and assessment of Plaintiff (Docket No. 11, pp. 446-452 of 815).  Mr. Spindler's findings reflect that Plaintiff has ADHD, predominately inattentive type, a depressive disorder, a generalized anxiety disorder, and a panic disorder with agoraphobia.  He assessed Plaintiff a Global Assessment of Functioning (GAF) score of 55[32] (Docket No. 11, pp. 451 of 815).  Mr. Spindler's prognosis noted that Plaintiff is likely to maintain her current level of mental health and general functioning for the foreseeable future based on her psychiatric treatment which consists of medication management by her primary care physician.  Mr. Spindler noted that Plaintiff did not appear to be entirely consistent in what she told him.  For instance, he wrote, that Plaintiff stated one of her reasons for being unable to return to work was the panic attacks she experiences, but noted having them for four or five years, which Mr. Spindler concluded means that she was dealing with her panic attacks and other problems while employed in the past.  Mr. Spindler opined that based on his examination, the Plaintiff appears to have an adequate level of knowledge for most aspects of daily living, adequate judgment for most routine matters, and has the mental ability to manage her funds should she be granted benefits (Docket No. 11, pp. 451 of 815).

Mr. Spindler's functional assessment noted that Plaintiff appears to be functioning in the low average range of intelligence and would be able to understand, remember, and carry out instructions in most job settings.  He opined that based on Plaintiff's medication, she appears to have the mental ability to maintain an adequate level of attention and concentration sufficient for many job settings (Docket No. 11, pp. 451 of

---

[32]

A GAF score of 55, is indicative of moderate symptoms (e.g. flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or social functioning (e.g., few friends, conflicts with peers or co-workers).

815).  Citing Plaintiff's history getting along with supervisors and co-workers and her average job performance ratings, Mr. Spindler concluded that Plaintiff seems capable of responding appropriately to supervision and to co-workers.  With respect to Plaintiff's abilities and limitations in the workplace, Mr. Spindler concluded that without the motivation for employment, Plaintiff is unlikely to deal well with routine stress in the workplace (Docket No. 11, pp. 452 of 815).

## E.   AGENCY DETERMINATIONS

On August 29, 2011, Dr. Robelyn Marlow, Ph.D. conducted a Psychiatric Review Technique for Plaintiff related to the Agency's initial evaluation of her disability claim finding that she suffers from affective disorders and anxiety-related disorders.  In assessing "Paragraph B" criteria,[33] Dr. Marlow determined Plaintiff has a mild degree of limitation with regard to activities of daily living and social functioning; a moderate degree of limitation in maintaining concentration, persistence or pace; and no repeated episodes of decompensation (Docket No. 11, pp. 71 of 815).  Dr. Marlow found no evidence of C criteria[34] (Docket No. 11, pp. 71 of 815).  Dr. Marlow also conducted a mental residual functional capacity (RFC) assessment for Plaintiff finding she was moderately limited in her  ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods, which she based on Plaintiff's preoccupation with somatic symptoms (Docket No. 11, pp. 75 of 815).

On September 7, 2011, Dr. Malika Haque M.D., conducted a physical RFC assessment for Plaintiff

---

[33]

Paragraph B criteria "describe impairment-related functional limiations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A) (West 2014).

[34]

Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A) (West 2014).

also related to the Agency's initial consideration of her disability claim (Docket No. 11, pp. 73-74 of 815).

Dr. Haque determined that Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand, walk, and sit for approximately six hours in an eight-hour work day, and had unlimited ability to push and pull (Docket No. 11, pp. 73 of 815). With respect to postural limitations, Dr. Haque opined that Plaintiff had unlimited ability to climb ramps or stairs, could frequently climb ladders, ropes, and scaffolding, balance, stoop, kneel, crouch, and crawl (Docket No. 11, pp. 74 of 815). Based on her review of the record, Dr. Haque concluded that Plaintiff is not disabled, indicating that while Plaintiff's conditions may cause her some limitations, that they do not prevent her from all work (Docket No. 11, pp. 76-77 of 815).

On December 6, 2011, Dr. Caroline Lewin, Ph.D. conducted a Psychiatric Review Technique of Plaintiff concerning the Agency's reconsideration of Plaintiff's disability claim. Dr. Lewin determined that Plaintiff suffers from affective disorders and anxiety-related disorders (Docket No. 11, pp. 86 of 815). In assessing "Paragraph B" criteria,[35] Dr. Lewin determined Plaintiff has a mild degree of limitation with regard to activities of daily living, a moderate degree of limitation in maintaining social functioning, concentration, persistence or pace; and no repeated episodes of decompensation (Docket No. 11, pp. 87 of 815). Dr. Lewin found no evidence of C criteria[36] (Docket No. 11, pp. 87 of 815). Dr. Lewin also conducted a mental RFC assessment for Plaintiff finding she was moderately limited in her ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods (Docket No. 11, pp. 90-91 of 815). Dr. Lewin opined that Plaintiff's limitations in

---

[35]

Paragraph B criteria "describe impairment-related functional limiations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A) (West 2014).

[36]

Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A) (West 2014).

21

concentration and persistence were due to her preoccupation with somatic symptoms (Docket No. 11, pp. 90-91 of 815). Dr. Lewin assessed moderate limitations for Plaintiff's abilities: to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Docket No. 11, pp. 91 of 815). Dr. Lewin did, however; indicate that Plaintiff is capable of infrequent, superficial interaction with customers and coworkers (Docket No. 11, pp. 91 of 815).

A physical RFC assessment conducted on December 6, 2011, by Dr. Sarah Long, M.D., and related to reconsideration of Plaintiff's disability claim, found that Plaintiff is capable of: occasionally lifting and carrying 20 pounds; frequently lifting or carrying 10 pounds; standing and walking for up to four hours during a typical eight-hour workday; sitting for up to six hours during a typical workday; and has unlimited abilities to push and pull (Docket No. 11, pp. 89 of 815). Dr. Long determined Plaintiff has postural limitations that require that she only occasionally climb ladders, ropes, and scaffods, but that she can otherwise frequently balance, stoop, kneel, crouch, and crawl (Docekt No. 11, pp. 89 of 815). Based on her review of the evidence, Dr. Long determined that Plaintiff is not disabled. Dr. Long indicated that Plaintiff's conditions may cause her limitations, but do not preclude her from all work (Docket No. 11, pp. 93 of 815).

### III. STANDARD OF DISABILITY

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*, 2014 WL 916945, *2 (N.D. Ohio 2014). At step one, a claimant must demonstrate she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)(citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). At step two, the claimant must show that she suffers from a "severe impairment." *Colvin*, 475 F.3d at

22

730.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic

work activities." *Id*. (citing *Abbott*, 905 F.2d at 923).  At step three, the claimant must demonstrate that

her impairment or combination of impairments meets or medically equals the listing criteria set forth in

20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d) (West 2014).  If the claimant

meets her burden she is declared disabled, however, if she does not, the Commissioner must determine

her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the

claimant's] limitations."  20 C.F.R. § 416.945(a) (West 2014).  In making this determination, the

regulations require the Commissioner to consider all of the claimant's impairments, including those that

are not "severe." 20 C.F.R. § 416.945(a)(2) (West 2014).  At the fourth step in the sequential analysis, the

Commissioner must determine whether the claimant has the residual functional capacity to perform the

requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014).  Past relevant

work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of

the established disability), which was substantial gainful work, and lasted long enough for the claimant to

learn to do it. 20 C.F.R. §§ 416.960(b), 416.965(a) (West 2014). If the claimant has the RFC to perform

her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014).  If, however; the

claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's

residual functional capacity, age, education, and work experience to determine whether the claimant can

make an adjustment to other work available. 20 C.F.R. §§ 416.920(a)(4)(v), (g) (West 2014).  While the

claimant has the burden of proof in steps one through four.  The Commissioner has the burden of proof at

step five to show "that there is work available in the economy that the claimant can perform." *Her v.*

*Comm'r of Soc. Sec*., 203 F.3d 388, 391 (6th Cir. 1999).  The Commissioner's finding must be "supported

by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."

*Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)(citation omitted).  If a claimant can make such an adjustment the claimant will be found not disabled. 20 C.F.R. §§ 416.920(a)(4)(v), (g) (West 2014).  If an adjustment cannot be made then the claimant is disabled. *Id.*

## IV. ALJ'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Kleber made the following findings:

1.  Ms. Gonzales has not engaged in in substantial gainful activity since May 23, 2011, the application date.

2.  Ms. Gonzales has the following severe impairments: scoliosis with neural foraminal stenosis at L5-S1, an irregular heartbeat, migraine headaches without aura, attention deficit disorder ("ADD"), and depression.

3.  Ms. Gonzalez does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.  After careful consideration of the entire record, [ALJ Kleber found that] Ms. Gonzales has the RFC to perform less than a full range of light work as defined in 20 C.F.R. § 416.967(b).  She can lift or carry up to 20 pounds occasionally and 10 pounds frequently, can sit for six hours of an eight-hour workday, and can stand or walk for six hours of an eight-hour workday, provided she changes positions at will without leaving her workspace. While she can occasionally climb ramps and stairs, she can never climb ladders, ropes, or scaffolds.  Furthermore, because she cannot maintain constant attention, she must avoid hazards, such as unprotected heights and uncovered moving machinery.  Finally, she can maintain occasional and superficial contact with co-workers and the public.

5.  Ms. Gonzales is unable to perform any past relevant work.

6.  Ms. Gonzales was born on April 23, 1971 and was 40 years old, which is defined as a younger individual age 18-49, on the date she filed the application.

7.  Ms. Gonzales has at least a high school education and is able to communicate in English.

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Ms. Gonzales is "not disabled," whether or not she has transferable job skills.

9.     Considering her age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform.

10.    Ms. Gonzales has not been under a disability, as defined in the Social Security Act, since May 23, 2011, the date she filed the application.

## V. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006).  On review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Miller*, 2014 WL 916945, at *3 (quoting 42 U.S.C. § 405(g)). "The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance." *Miller*, (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)).  "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole*, 661 F.3d at 937 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VI. DISCUSSION

25

**A.** **PLAINTIFF'S ALLEGATIONS**

In her Brief on the Merits, Plaintiff alleges that the ALJ erred by failing to: (1) complete a full analysis of her pain complaints; (2) make an RFC determination supported by substantial evidence; and (3) determine that Plaintiff's Hashimoto Disease was a severe impairment (Docket No. 16, pp. 13-21 of 22).

**B.** **DEFENDANT'S RESPONSE**

Defendant disagrees with Plaintiff's contentions and argues that the ALJ's decision concerning Plaintiff's Hashimoto Disease, her RFC assessment, and Plaintiff's subjective complaints was appropriate and supported by substantial evidence (Docket No. 17, pp. 7-17 of 19).

**C.** **DISCUSSION**

For ease of disposition and efficiency, the undersigned addresses each of the Plaintiff's assignments of error and their supporting arguments in the order in which they correspond to the disability analysis.

**1.** **WHETHER THE ALJ'S STEP-TWO "SEVERE" IMPAIRMENT ANALYSIS IS SUPPORTED BY SUBSTANTIAL EVIDENCE**

Plaintiff alleges the ALJ erred by failing to find her Hashimoto Disease was a "severe" impairment at step two of the five-step sequential analysis for a disability evaluation (Docket No. 16, pp. 19-21 of 22).  In support, Plaintiff argues that under the prevailing *de minimis* view applied in the Sixth Circuit, Hashimoto Disease is a severe impairment and that the ALJ should have assessed appropriate limitations (Docket No. 16, pp. 20-21 of 22). Defendant disagrees and argues that Plaintiff's claim concerning her Hashimoto Disease is undermined by the fact that counsel did not list the condition among Plaintiff's severe impairments when asked by the ALJ at the administrative hearing (Docket No. 17, pp. 7 of 19).  Defendant also contends that the ALJ's step-two finding concerning Plaintiff's Hashimoto

26

Disease is legally irrelevant since Plaintiff's case was not decided at step-two (Docket No. 17, pp. 8 of 19).

### A. COUNSEL'S STATEMENTS AT THE ADMINISTRATIVE HEARING

"When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits. *Glenn v. Sec'y of Health & Human Servs*., 814 F.2d 387, 391 (7th Cir. 1987); *accord Ross v. Comm'r of Soc. Sec*., 2013 WL 1284031, *14 (N.D. Ohio 2013); *Neeld v. Comm'r of Soc. Sec*., 2012 WL 1906387, *8 (N.D. Ohio 2012). During the Administrative Hearing, ALJ Kleber asked counsel for Plaintiff's severe impairments, which she noted as lumbar disc degeneration, mild discogenic degenerative changes, ADD, depressive disorder, migraine headaches, chest pain, and tachycardia (Docket No. 11, pp. 43 of 815). The record also reflects that Counsel did not mention Plaintiff's Hashimoto Disease during her opening statement and did not otherwise elicit any information about such condition during her questioning of Plaintiff (Docket No. 11, pp. 41;50-58 of 815).

### B. ALJ KLEBER'S STEP-TWO ANALYSIS

At step two of the five-step sequential analysis for evaluation of a disability, the ALJ was required to consider the nature of Plaintiff's alleged impairments on her capabilities to perform basic work activities. *See* 20 C.F.R. § 404.1520(c) (West 2014). The "regulations do not require the ALJ to designate each impairment as 'severe' or 'non-severe;' rather, the determination at step two is merely a threshold inquiry." *Jones v. Comm'r of Soc. Sec.*, 933 F.Supp.2d 934, 948 (N.D. Ohio 2013)(citing 20 C.F.R. § 404.1520(a)(4)(ii)). "Step two has been described as a '*de minimus* hurdle;' that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007); *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Farris v. Sec'y of Health &*

27

*Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985).  However, "[t]he mere diagnosis of [a condition] of course says nothing about the severity of the condition." *Higgs*, 880 F.2d at 863.

Plaintiff argues that her Hashimoto Disease is a severe impairment and that the weight gain and fatigue associated with the condition affects her ability to perform work related activities (Docket No. 16, pp. 20-21 of 22).  Defendant disagrees and contends that the severity of Plaintiff's Hashimoto Disease is legally irrelevant because the ALJ did not decide her case at step two. (Docket No. 17, pp. 8 of 19). In support of his contention, Defendant cites *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

In *Maziarz*, the claimant sought review of the denial of his disability benefits and argued, relevant to this case, that the Secretary erred in failing to find his cervical condition was a severe impairment. *Maziarz*, 837 F.2d at 244.  The Sixth Circuit disagreed and noted that once the Secretary finds a claimant has one severe impairment, the regulations require the Secretary to continue with the remaining steps of the disability evaluation. *Id.*  The *Maziarz* court reasoned that "[s]ince the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Secretary's failure to find the claimant's cervical condition constituted a severe impairment could not constitute reversible error." *Id.* Courts in this district have repeatedly applied *Maziarz* in rejecting claims that a ALJ erred by failing to classify a claimant's additional impairments as "severe" at step two. *See Jones*, 933 F. Supp.2d at 948; *Walton v. Astrue*, 773 F.Supp. 742, 747 (N.D. Ohio 2011); *Norman v. Astrue*, 694 F.Supp.2d 738, 751 (N.D. Ohio 2010); see also SSR 96-8P, 1996 WL 374184, at *5 (July 2, 1996) (after finding that at least one impairment is "severe," the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'").

The ALJ's decision reflects she considered Plaintiff's Hashimoto Disease in her RFC analysis as

she included a citation to page seven of exhibit 11F in her summary and analysis of Plaintiff's physical health records, which contains Dr. Jeet's initial consultation report and diagnosis of Plaintiff's Hashimoto Disease (Docket No. 11, pp. 23; 489 of 815).  Therefore, even assuming Plaintiff is correct in that Plaintiff's Hashimoto Disease should have been categorized as "severe," any error by the ALJ was harmless given the ALJ's consideration of the impairment in her RFC analysis.

### 2. WHETHER THE ALJ ERRED IN HER ANALYSIS OF PLAINTIFF'S PAIN AND THE OBJECTIVE EVIDENCE

Plaintiff also maintains that the ALJ's RFC analysis is not supported by substantial evidence and essentially argues that the ALJ's analysis and findings concerning the intensity, persistence, and limiting affects of her alleged symptoms were incomplete because the ALJ failed to consider relevant regulatory factors, ignored certain objective and medical findings, and erred in considering her statements about her symptoms and their effects on her functional abilities (Docket No. 16, pp. 13-16 of 22).  Defendant disagrees with Plaintiff's contentions and argues that the ALJ reasonably concluded that the objective evidence did not support the degree of limitations Plaintiff alleges, properly considered the medical opinions of her doctors, and made appropriate findings concerning Plaintiff's medications, treatment, and statements (Docket No. 17, pp. 14-17 of 19).

"[S]tatements about [a claimant's] pain or other symptoms will not alone establish that [the claimant] is disabled." 20 C.F.R. § 416.929(a) (West 2014); SSR 96-7P, 1996 WL 374186, *2 (July 2, 1996).  When evaluating complaints of disabling pain, a two part analysis is used. *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 247 (6th Cir. 2007); *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994)  First, the ALJ must determine whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. *Rogers*, 486 F.3d at 247; SSR 96-7P, 1996 WL 374186, *2 (July 2, 1996).  Second, if the ALJ determines that such an impairment exists, then

29

the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.* The regulations include relevant factors the ALJ is to consider in evaluating the claimant's symptoms including the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms, such as lying on one's back; and any other factors bearing on the limitations of the claimant to perform basic functions. 20 C.F.R. §§ 416.929(c)(3), (i)-(iv) (West 2014); *Rogers*, 486 F.3d at 247.

Whenever a claimant's statements concerning "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the individuals statements based on consideration of the entire case record." SSR 96-7P, 1996 WL 374186, *2 (July 2, 1996); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)("In evaluating complaints of pain, an ALJ may properly consider the credibility of the claimant.") The ALJ must scrutinize the claimant's statements for consistency with the evidence. *Rogers*, 486 F.3d at 247. "Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Id.* at 248.

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters*, 127 F.3d at 531. "Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id.* The ALJ's credibility findings must be "sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reasons for that weight." *Rogers*, 486 F.3d at 248 (quoting SSR 96-7P).

In her evaluation of the Plaintiff's subjective complaints, the ALJ summarized the Plaintiff's objective medical record, including the MRI and x-rays that the Plaintiff alleges the ALJ ignored (Docket No. 11, pp. 23 of 815).  Next, the ALJ highlighted the inconsistent physical and psychological examination findings and provided citations to the offending records including those concerning Plaintiff's lumbar tenderness, straight-leg raise testing, gait, strength, and range of motion, which is among the evidence Plaintiff relies on in arguing that there is objective evidence that her pain is disabling (Docket No. 11, pp. 23 of 815; Docket No. 16, pp. 14-15 of 22).[37]  Accordingly, Plaintiff's contention concerning the MRI, x-rays, and medical findings is without merit.

In determining that Plaintiff's treatment was inconsistent with that of a totally disabled individual, the ALJ noted the Plaintiff has maintained a medication regimen since her alleged onset date, listed some of the medications she has taken, her PVC ablation procedure, participation in physical therapy, and use of a cane (Docket No. 11, pp. 24 of 815).  Plaintiff contends that the ALJ erred by failing to consider all of her medications, and side effects.  Plaintiff also challenges the ALJ's conclusion that her treatment is inconsistent with a totally disabled individual on the basis that it lacks medical support (Docket No. 16, pp. 15 of 22).  Plaintiff does not cite and the Court is unaware of any legal precedent which requires the ALJ to include an exhaustive list of the Plaintiff's medications or side effects in her decision.  Instead the Plaintiff's medications and treatment are among factors the ALJ is required to consider in assessing the credibility of an individual's symptoms. See 20 C.F.R. §§ 416.929(c)(3)(iv), (v) (West 2014).  With respect to the ALJ's conclusions concerning Plaintiff's treatment, the ALJ's findings are conclusive so long as they are supported by substantial evidence. *See Miller*, 2014 WL 916945, at *3.

---

[37]

In addition to being inconsistent, Plaintiff relies upon this evidence in support of an argument that is legally insignificant because the ALJ's decision is not subject to reversal simply because substantial evidence exists of a different conclusion, rather the test is whether the ALJ's determination is supported by substantial evidence.  *See Buxton*, 246 F.3d at 772.

The case record contains substantial evidence that Plaintiff's disabilities had improved with treatment.  Plaintiff's most recent medical records reflect that she reported to Dr. Bej that her Adderall medication was most effective out of all of the medications she had tried and that her grades were good (Docket No. 11, pp. 781 of 815).  From December 2011 through April 2012, Dr. Bej's treatment records note the frequency of Plaintiff's migraine headaches at approximately zero each month and that during that four- month period of time, Plaintiff reported having just two migraine headaches (Docket No. 11, pp. 781-785 of 815).  In March 2012, Plaintiff reported to Dr. Malak that she had stopped taking Zanaflex, Neurontin, not taken Topamax, and felt that Daypro was causing her weight gain and swelling, but she also reported, quite significantly, that her lower back and leg pain had improved with physical therapy (Docket No. 11, pp. 590 of 185). Physical therapy records from February through April 2012, also reflect that Plaintiff's pain level had decreased to a two or three out of ten (Docket No. 11, pp. 608-614 of 815).  Her physical therapy discharge summary also reflects that Plaintiff had an injection and reported significant improvement in April 2012 (Docket No. 11, pp. 607 of 815).

The evidence concerning Plaintiff's improvements are contradicted only by Plaintiff's statements and testimony concerning her symptoms.  As the ALJ highlighted in her decision, there are several inconsistencies between Plaintiff's statements, testimony, and the record including Dr. Ahn's findings that Plaintiff uses a cane in the wrong hand for her alleged symptoms, inconsistencies between the record and Plaintiff's testimony concerning the length of her enrollment in online college courses; Plaintiff's rationale for quitting school; Mr. Spindler's questions about Plaintiff's reliability in describing her panic attacks, and Dr. Ahn's concerns about Plaintiff's motivation for treatment (Docket No. 11, pp. 24 of 815).

Plaintiff's final assignment of error is that the ALJ did not adequately consider the relevant factors for evaluating her statements concerning her symptoms (Docket No. 16, pp. 13; 15-16 of 22).  In support, Plaintiff offers her own statements from the record  (Docket No. 16, pp. 15-16 of 22). The regulations

require the ALJ to *consider* the factors in § 416.929(c)(3)(i)-(vii), and the ALJ's decision reflects that she comported with that requirement.  There is no requirement that the ALJ expressly engage in an exhaustive factor-by-factor analysis in credibility determinations.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012)("The ALJ is not required to discuss methodically each [of the 416.929(c)(3)(i)-(vii) factors], so long as he acknowledged and examined those considerations before discounting a claimant's subjective complaints")(citation omitted);  Cf. *Hatmaker v. Comm'r of Soc. Sec.*, 965 F.Supp.2d 917, 927 (E.D. Tenn. 2013)(holding in an analogous context that the ALJ must consider factors in 20 C.F.R. § 404.1527(c)(2), in determining the credibility to give a treating source, but that an exhaustive factor-by-factor analysis is not required so long as the record is clear to subsequent reviewers the weight attributed to the opinion and the reasons for that determination).

In this case, the ALJ summarized Plaintiff's treatment, medications, and statements concerning the severity and intensity of her symptoms, the objective medical records, and medical source findings (Docket No. 11, pp. 22-25 of 815).  The ALJ considered Plaintiff's testimony and statements but ultimately concluded that they were not entirely reliable.  While Plaintiff's scoliosis is well documented throughout the record, the only evidence concerning the intensity, duration, frequency, and persistence of her pain consists almost entirely of her subjective complaints. Given the inconsistencies in Plaintiff's testimony and statements with the case record, the Court has serious reservations about the Plaintiff's overall credibility and agrees with the ALJ that there is evidence to suggest that Plaintiff is exaggerating her symptoms and inaccurately representing her limitations (Docket 11, pp. 24 of 815).  Despite such inconsistencies, the ALJ did not altogether discredit and dismiss Plaintiff's statements and testimony. Instead the ALJ choose to credit Plaintiff's complaints to some degree in assessing a limitation for Plaintiff's RFC that she be permitted to change positions without leaving her workspace to account for her pain (Docket No. 11, pp. 22; 25 of 815).   Given the lack of objective evidence or medical findings to

33

support the severity alleged by Plaintiff's statements, the ALJ's decision to assess Plaintiff's limitation

for pain is supported by substantial evidence.

### 3.    WHETHER THE ALJ'S RFC ASSESSMENT IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Plaintiff alleges that the ALJ's RFC analysis is not supported by substantial evidence and argues

that the ALJ did not adequately address RFC limitations for Plaintiff's ADD impairment, potential for

work related stress, migraine headaches, and scoliosis (Docket No. 16, pp. 17-19 of 22).  For her

contentions concerning her ADD related issues, Plaintiff relies upon the ALJ's step three findings

concerning "moderate limitations" to argue that the ALJ should have assessed RFC limitations for

Plaintiff's ability to engage in routine or repetitive tasks (Docket No. 16, pp. 17 of 22).  Defendant

disagrees and contends that Plaintiff misconstrues the ALJ's decision at step three and cites *Hux v.*

*Astrue*, 2012 WL 4498845, at *4 (W.D. Pa. 2012), to argue that the ALJ's step three findings are only

relevant for the purpose of determining whether the RFC assessment is needed and has no bearing on the

content of that decision (Docket No. 17, pp. 10-11 of 19).  Defendant also maintains that even if Plaintiff

has moderate limitations in concentration, persistence, or pace, those limitations have been accounted for

in the light and unskilled representative occupations provided by the ALJ in her analysis (Docket No. 17,

pp. 11 of 19).

Plaintiff misconstrues the ALJ's step three findings.  At step three, the ALJ noted in her decision

that "despite her mental impairments, [Plaintiff] cares for her personal needs, prepares meals, drives,

shops, uses a computer, pays bills, handles a checking account, and maintains relationships . . . These

activities suggest she does not suffer *from more than* moderate limitations with her activities of daily

living, social functioning, or concentration, persistence or pace . . ." (Docket No. 11, pp. 22 of

815)(emphasis added).  The ALJ's findings were within the context of her consideration of whether

Plaintiff satisfied the listing criteria. 20 C.F.R. § 416.920(c) (West 2014).  The relevant listings for

34

Plaintiff's case required the ALJ to consider whether Plaintiff's mental impairments result in "marked" limitations or restrictions, in two of the following areas: activities of daily living, social functioning, concentration, persistence, or pace; or repeated episodes of decompensation, each of an extended duration. 20 C.F.R. Part 404, Subpart P., Appendix 1, at §§ 12.02B, 12.04B (West 2014).  The ALJ did not expressly provide her findings for each of these areas, instead determining that Plaintiff's activities suggest that she does not suffer from more than moderate limitations in these areas, which is less severe than necessary to satisfy the listing criteria. *Id.*; (Docket No. 11, pp. 22 of 815).  Since the ALJ determined that Plaintiff impairment did not meet or equal the listed impairment, the regulations required the ALJ to assess and make a finding concerning the Plaintiff's RFC under the next step of the five-step sequential evaluation process.  *See* 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is the most the Plaintiff is capable of doing in a work related setting despite her limitations. *See* 20 C.F.R. 416.945(a)(1) (West 2014).  In making an RFC determination, the regulations require the ALJ to consider a broader array of factors than required at step three, including the claimant's pain, non-severe impairments and the relevant medical or other evidence concerning claimant's limitations on the claimant's physical, mental or other abilities to perform their past work or any other work. *See* 20 C.F.R. § 416.945 (West 2014).  Therefore, the relevant inquiry is whether the ALJ applied the appropriate legal standard and whether her RFC findings are supported by substantial evidence.

In her decision, ALJ Kleber afforded Dr. Caroine Lewin's opinion great weight in her analysis (Docket No. 11, pp. 24 of 815).  Dr. Lewin completed a mental RFC assessment for Plaintiff which assessed some moderate limitations in concentration, persistence and social interaction, but opined that Plaintiff was capable of infrequent, superficial interaction with customers and coworkers despite her variable limitations in concentration and persistence (Docket No. 11, pp. 90-91 of 815).  Mr. Spindler's

35

mental RFC assessment, which ALJ Kleber afforded some weight, assessed Plaintiff as having no

limitations in her ability to understand, remember, and carry out job instructions, and mild limitations in

Plaintiff's ability to maintain attention and concentration (Docket No. 11, pp. 25; 446-452 of 815).  While

Mr. Spindler opined that Plaintiff seemed unlikely to be able to deal with work related stressors, he

determined that Plaintiff appeared to have the mental ability to maintain adequate levels of attention and

concentration sufficient for many job settings (Docket No. 11, pp. 451-452 of 815).

Plaintiff alleges the ALJ erred by failing to adequately consider and address limitations for her

concentration and focus issues in the ALJ's RFC assessment (Docket No. 16, pp. 17 of 22).  In support,

Plaintiff argues that the ALJ should have assessed limitations for her ability to complete routine and

repetitive tasks and reasons that with the severe impairment of ADD, there would necessarily be

limitations in Plaintiff's ability to concentrate and focus.  Plaintiff's contentions rely on faulty logic and

are without merit.  Contrary to Plaintiff's claim, ALJ Kleber specifically mentioned Plaintiff's ADD

impairment during her analysis of Dr. Haque's physical RFC assessment noting, "[Plaintiff's] attention

deficits support only occasional exposure to ladders, ropes, and scaffolds and no exposure to hazards,

such as unprotected heights and moving machinery" (Docket No. 11, pp. 24 of 815).  While Plaintiff

contends that there should have been additional limitations for Plaintiff's ability to perform routine and

repetitive tasks, none of the mental RFC assessments contained in the record noted any limitations in

Plaintiff's abilities to carry out instructions, sustain a routine, or perform activities within a schedule

(Docket No. 11, pp. 75; 90; 451-452 of 815).

Plaintiff next alleges that the ALJ should have included a limitation with respect to Plaintiff's

stress citing Mr. Spindler's findings that Plaintiff seems unlikely to deal well with routine stressors in the

work place, and Plaintiff's reports of physical aggression towards others and panic attacks (Docket No.

16, pp. 18 of 22).  ALJ Kleber's decision reflects that she took Plaintiff's work related stress and panic

36

attacks into account in her RFC assessment despite the lack of corroborating objective evidence.[38]

During her analysis of Dr. Robelyn Marlow's mental RFC assessment for Plaintiff, ALJ Kleber noted that

Plaintiff "also requires limited contact with others" (Docket No. 11, pp. 25 of 815).  In her RFC

assessment, ALJ Kleber specifically provides that Plaintiff "can maintain occasional and superficial

contact with co-workers and the public" (Docket No. 11, pp. 22 of 815).

Plaintiff alleges that the ALJ should have included a limitation with respect to Plaintiff's migraine

headaches citing Plaintiff's testimony that her headaches would last between two and five days and an

office treatment record in which Plaintiff reported four migraines a month in January of 2011 (Docket

No. 16, pp. 18 of 22).  Plaintiff's contention lacks merit and is inconsistent with the record.  In September

2011, Plaintiff's treatment records from Dr. Bej note the frequency of Plaintiff's migraine headaches at

approximately two per month (Docket No. 11, pp. 554 of 815).  In October of 2011, Plaintiff reported the

frequency of her migraine headaches at approximately zero per month (Docekt No. 11, pp. 553 of 815).

From December 2011 through April 2012, Plaintiff reported one migraine headache and the records

reflect that her medication had been very effective (Docket No. 11, pp. 781-785 of 815).

Finally, Plaintiff alleges that the ALJ's RFC assessment is not supported by substantial evidence

because the ALJ did not assess limitations for bending.  Plaintiff argues that with scoliosis, she would

have difficulty bending and that Dr. Shaia determined that Plaintiff could not bend to the left (Docket No.

16, pp. 18-19 of 22).  Substantial evidence supports the ALJ's decision not to assess a bending limitation

for Plaintiff.  The only physical RFC assessments contained in the record consists of those of the State

---

[38]

The evidence concerning Plaintiff's panic attacks consists of medication management and her subjective reports describing her panic attacks.  As the ALJ noted in her decision there are questions concerning the reliability of Plaintiff's statements concerning her panic attacks on account of her reports to Mr. Spindler (Docket No. 11, pp. 24 of 815).  Plaintiff reported to Mr. Spindler that one of the reasons she could not return to work was her panic attacks but noted that she has suffered from panic attacks for the past four or five years which means that she previously dealt with her panic attacks while employed (Docket No. 11, pp. 451 of 815).

Agency's consultative physicians both of whom determined that Plaintiff could frequently balance, stoop, crouch, and crawl (Docket No. 11, pp. 74; 89 of 815).

For the foregoing reasons, the undersigned finds the ALJ's RFC assessment and analysis is supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, this Magistrate affirms the decision of the Commissioner.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date: May 21, 2014